**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **JEANA COLLINS**<br><br>v.<br><br>**MEDICAL DEVICE BUSINESS SERVICES, INC., DEPUY SYNTHES SALES, INC., JOHNSON & JOHNSON, AND JOHNSON & JOHNSON SERVICES, INC.** | **Case No.:**   2:26-cv-01916-RMG<br><br>**COMPLAINT AND JURY DEMAND** |

COMES NOW, Plaintiff, Jeana Collins, who by and through her undersigned counsel submits this Complaint against Medical Device Business Services, Inc. f/k/a DePuy Orthopaedics, Inc., Depuy Synthes Sales, Inc., Johnson & Johnson, and Johnson & Johnson Services, Inc. (hereinafter "Defendants"), and alleges the following:

## NATURE OF THE ACTION

1.      This action seeks to recover damages for injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct of Medical Device Business Services, Inc., Depuy Synthes Sales, Inc., Johnson & Johnson, and Johnson & Johnson Services, Inc. in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the Pinnacle® acetabular cup system, a medical device used in hip replacement surgeries.

## PARTIES

2.      Plaintiff, Jeana Collins, is a person of full age of majority and is a citizen of and domiciled in Summerville, Dorchester County, South Carolina.

3.      At all relevant times, during the course of her initial hip replacement with the Pinnacle® acetabular cup system and her revision surgery, Plaintiff was a citizen and adult resident

of Summerville, Dorchester County, South Carolina. Plaintiff was implanted with the Pinnacle® acetabular cup system at Conway Medical Center located in Conway, Horry County, South Carolina. Plaintiff had the implanted Pinnacle® acetabular cup system removed at East Cooper Medical Center located in Mt. Pleasant, Charleston County, South Carolina. Plaintiff has suffered damages as a result of Defendants' illegal and wrongful conduct alleged herein.

4.    Medical Device Business Services, Inc. (f/k/a DePuy Orthopaedics, Inc.) ("DePuy"), is a corporation organized under the laws of the State of Indiana with its principal place of business located in Warsaw, Indiana, which at all times pertinent hereto, was doing business in the State of South Carolina and within the jurisdiction of this Honorable Court.

5.    DePuy Synthes Sales, Inc. ("DePuy Synthes") is a corporation organized and existing under the laws of the State of Massachusetts with its principal place of business located in Raynham, Massachusetts, which at all times pertinent hereto, was doing business in the State of South Carolina and within the jurisdiction of this Honorable Court.

6.    Johnson & Johnson ("J&J") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located in New Brunswick, New Jersey, which at all times pertinent hereto, was doing business in the State of South Carolina and within the jurisdiction of this Honorable Court.

7.    Johnson & Johnson Services ("J&J Services") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located in New Brunswick, New Jersey, which at all times pertinent hereto, was doing business in the State of South Carolina and within the jurisdiction of this Honorable Court.

2

8. At all times pertinent hereto, and upon information and belief, DePuy and/or DePuy Synthes were wholly owned subsidiaries of J&J and/or J&J Services, and accordingly, J&J and/or J&J Services are legally responsible for the tortious conduct complained of herein.

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. There is complete diversity between Plaintiff and Defendants. Plaintiff, at all relevant times, was a resident and citizen of the State of South Carolina. As set forth above, all Defendants are entities organized in states other than the State of South Carolina, all Defendants have their principal place of business in a state other than the State of South Carolina, and none of the Defendants are citizens or residents of the State of South Carolina.

10. The District of South Carolina has personal jurisdiction over Defendants, each of which is licensed to conduct and/or is systematically and continuously conducting business in the State of South Carolina, including, but not limited to the marketing, advertising, selling, and distributing of medical devices, including the Pinnacle® acetabular cup system, to the residents of this State.

11. As alleged *infra*, Plaintiff's injuries complained of in the instant civil action "arise out of" or "relate to" Defendants' contacts with the State of South Carolina.

12. At all times relevant hereto, Defendants have been "doing business" and have committed tortious acts, in whole or in part, within the State of South Carolina.

13. At all times relevant hereto, Defendants have employees, contractors and/or agents in the State of South Carolina.

3

14.     At all times relevant hereto, Defendants actively marketed the Pinnacle® acetabular cup system within the State of South Carolina by providing marketing information about the medical device to medical doctors and providers of medical treatment throughout the State of South Carolina.

15.     At all times relevant hereto, Defendants solicited purchases of the Pinnacle® acetabular cup system within the State of South Carolina by soliciting purchases of Pinnacle® acetabular cup system from medical doctors and providers of medical treatment throughout the State of South Carolina.

16.     Upon information and belief, at all times relevant hereto, Defendants provided product information about the Pinnacle® acetabular cup system to medical doctors and providers of medical treatment throughout the State of South Carolina.

17.     At all times relevant hereto, Defendants sold the Pinnacle® acetabular cup system within the State of South Carolina by selling the medical device to medical doctors and providers of medical treatment throughout the State of South Carolina.

18.     At all times relevant hereto, Defendants shipped the Pinnacle® acetabular cup system to the State of South Carolina by shipping the medical device to medical doctors and providers of medical treatment throughout the State of South Carolina.

19.     At all times relevant hereto, Defendants expected that the Pinnacle® acetabular cup system would be sold, purchased, and used in the State of South Carolina.

20.     At all times relevant hereto, Defendants purposefully directed their activities towards the State of South Carolina.

21.     At all times relevant hereto, Defendants exercised the privilege of conducting business in the State of South Carolina.

22.     At all times relevant hereto, Defendants enjoyed the benefits and protections of laws of the State of South Carolina.

23.     At all times relevant hereto, Defendants' activities in the State of South Carolina were neither irregular nor casual; rather, those activities were systematic and continuous.

## FACTUAL BACKROUND

### I.     Defendants' Involvement in the Development, Testing, Marketing, and Sale of the Pinnacle® Acetabular Cup System.

24.     The Pinnacle® acetabular cup system is a medical device used in the treatment of various hip related orthopedic surgeries including, but not limited to, total hip arthroplasties.

25.     The Pinnacle® acetabular cup system is a metal cup, composed of Cobalt and Chrome alloy, which is inserted into the socket of the pelvis to function as the cup component of a hip replacement implant.

26.     A femoral head, or ball, is then attached to a femoral stem within the patient's femur.

27.     The femoral head then comes to rest and articulates within the Pinnacle® acetabular cup.

28.     The Pinnacle® acetabular cup and the femoral head are separated by a liner.

29.     Upon information and belief, Defendants designed the Pinnacle® acetabular cup system to allow for different types of liners to be inserted within the Pinnacle® acetabular cup system. These interchangeable liners for use with the Pinnacle® acetabular cup system include and/or at one time included the use of both metal, Cobalt and Chrome, liners and/or polyethylene liners.

30.     Defendants designed and manufactured the Pinnacle® acetabular cup system along with the associated liners for use with the system.

31. Defendants, including J&J, and their subsidiaries, have at all pertinent times participated in developing the Pinnacle® acetabular cup system and associated liners, have approved the sale of the product worldwide, have held the product out as their own, have promoted the product, have exercised ultimate controlling authority over the product's design and promotion, have sold the product and derived substantial revenue from its sale, and have acted as the responsible authority for the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of the product at issue in this litigation.

32. Defendants marketed the Pinnacle® acetabular cup system and associated liners across the United States, including within the State of South Carolina.

33. Defendants through their sales agents, representatives, and/or employees developed relationships of trust with orthopedic surgeons within the State of South Carolina by being present in operating rooms with surgeons during the implantation of the Pinnacle® acetabular cup system and associated liners.

34. Medical providers within the State of South Carolina relied upon the representations made by Defendants and their agents/sales representatives regarding the Pinnacle® acetabular cup system and its associated liners.

35. Defendants ultimately sold substantial quantities of Pinnacle® acetabular cup systems and associated liners within the United States, including within the State of South Carolina, and derived lofty profits from such sales.

36. Defendants, in developing the Pinnacle® acetabular cup system and associated liners, did not seek approval under the Federal Food and Drug Administration's ("FDA") Pre-market Approval Process ("PMA").

37.     The PMA process is the most stringent type of device marketing application required by the FDA. As such, when a manufacturer seeks approval to sell and market its device under the PMA process, the manufacturer must demonstrate through sufficient and valid scientific evidence that the device in question is both safe and effective for its intended use.

38.     Defendants herein made no such showing that the Pinnacle® acetabular cup system and its associated liners were safe and effective for its intended use.

39.     Rather, Defendants utilized the FDA loophole, otherwise referred to as the 510(k) process, to bring their Pinnacle® acetabular cup system and associated liners to market.

40.     Under the 510(k) process, a manufacturer can receive approval to sell and market their device upon a showing that the device is substantially similar to another device which was previously approved by the FDA under the PMA process.

41.     By utilizing the 510(k) process, Defendants did not provide sufficient and valid scientific evidence to establish that the Pinnacle® acetabular cup system and its associated liners, including its polyethylene liners, were safe and effective for their intended use.

42.     Here, Defendants sought approval to sell and market the Pinnacle® acetabular cup system and its associated liners based upon the prior approval of metal-on-metal hip implant systems approved under the PMA process in the 1960's and 1970's.

43.     However, these prior metal-on-metal hip replacements of the 1960's and 1970's ultimately failed due to high rates of heavy metal poisoning which resulted in tissue death, bone loss, and early implant failure.

44.     Defendants were well-aware of the problems of the past. Specifically, Defendants knew, based on the failed metal-on-metal products of the past, that when a Cobalt and Chrome surface, such as the Pinnacle® acetabular cup system, is articulated against by a metal-on-metal

7

femoral head or other hard surface such as ceramic, the Cobalt and Chrome surface of the acetabular cup will generate metal wear which results in the release of toxic metal Cobalt and Chrome ions into the body.

45.     These toxic metal ions can lead to tissue destruction/death, pseudotumors, bone loss, dislocations, early implant failure and the need for revision.

46.     Likewise, due to the knowledge and experience in designing and manufacturing total hip arthroplasties, the Defendants understood that in order for a hip arthroplasty to be safe, functional and stable, the liner between an acetabular shell and the articulating metal head must be affixed into place to avoid instability, dissociation, dislocation, pain and suffering, and excessive wear.

47.     In addition to the risk of metallosis, Defendants knew or should have known that the dissociation of its polyethylene liner from the acetabular cup carried with it additional risks including but not limited to increasing the risk of instability and dislocation of the hip, pain and discomfort, and accelerated and excessive wear, beyond what was normally anticipated, which could lead to multiple complications including but not limited to loosening of the acetabular cup component.

48.     Based upon their knowledge of the failures of the past, as well as their involvement in significant litigation regarding the use of the Pinnacle® acetabular cup system with metal liners and metal femoral heads in *In re Pinnacle Products Liability Litigation*, MDL 3:11-md-02244, Defendants were well aware at the time of Plaintiff's initial implant surgery in August of 2020, that the risk of contact/articulation directly against the Pinnacle® acetabular cup Cobalt and Chrome cup could result in the generation of toxic metal ions with catastrophic injury to the patient. This risk was inherently known and foreseeable to Defendants.

49.     Furthermore, Defendants knew that in order for a total hip arthroplasty to be functional, all components must be properly held in place, including but not limited to the polyethene liner within the acetabular cup. Defendants were aware that should a liner loosen, there was an increased risk of hip dislocation, pain and discomfort, as well as excessive wear, well beyond that which reasonably is anticipated, which could also lead to device instability and failure even in the absence of metal wear.

50.     Upon information and belief, due to the utilization of the 510(k) process, Defendants never performed sufficient and/or adequate testing to ensure that their Pinnacle® acetabular cup system and its associated polyethylene liners were designed in such a way to prevent the polyethylene liners from disassociating and causing articulation from a metal and/or ceramic femoral head with the metal acetabular cup of the Pinnacle® acetabular cup system.

51.     Defendants should have known that what little laboratory tests they relied upon to market the Pinnacle® acetabular cup system and associated liners did not represent clinical use and therefore did not provide reasonably reliable data for the safety or efficacy of the Pinnacle® acetabular cup system.

52.     Defendants knew or should have known that the metal ions generated from articulation against the metal Pinnacle® acetabular cup when a polyethylene liner disassociates were toxic and could cause, among other injuries, high metal levels, metallosis, pseudotumors, infection, device failure, tissue death, bone death, neurological issues and many other complications including pain and loss of function.

53.     Defendants knew or should have known that a broken locking mechanism would cause the polyethylene liner to loosen causing the hip arthroplasty to become unstable and lead to an increased risk of dislocation, pain and discomfort, and increased risk of excessive wear.

54.    Upon information and belief, Defendants never conducted any real life or simulator testing which mimicked real life conditions to determine whether or not the Pinnacle® acetabular cup system could use interchangeable liners in a safe and effective manner. Defendants never conducted testing to determine whether a metal liner, ceramic liner, or polyethylene liner required different locking mechanisms and/or a different construction within the Pinnacle® acetabular cup to prevent disassociation.

55.    Upon information and belief, Defendants never explored whether the locking mechanism and design of the Pinnacle® acetabular cup was sufficient to properly hold its associated polyethylene liners in place as opposed to its other interchangeable liners.

56.    Polyethylene liners are considered the gold standard of articulating surface areas in hip implants. When properly held in place, polyethylene liners, allow metal and ceramic femoral heads to articulate within a metal shell such as the Pinnacle® acetabular cup without generating metal ions and without generating excessive poly wear.

57.    However, even after Defendants' metal liners for its Pinnacle® acetabular cup catastrophically failed, Defendants undertook no efforts to assess the safety and efficacy of its polyethylene liners within the Pinnacle® acetabular cup system.

58.    Likewise, Defendants undertook no efforts to redesign the Pinnacle® acetabular cup even after the failure of its Pinnacle® metal-on-metal system.

59.    As a result, Defendants have sold and continue to sale Pinnacle® acetabular cup systems and polyethylene liners without adequate testing to confirm whether the design and/or construction of such an acetabular cup and polyethylene liner are safe and effective in preventing catastrophic injuries.

60.     Defendants marketed the Pinnacle® acetabular cup system as if it was not subject to the need for revision as liners could be easily replaced without having to remove the cup. This design element was of great interest to surgeons and resulted in the Pinnacle® acetabular cup system being widely implanted within the United States.

61.     Even today, the Pinnacle® acetabular cup system is a widely used system in hip replacement surgeries throughout the country.

62.     Upon information and belief, Defendants assumed that the locking mechanism and design of the Pinnacle® acetabular cup was sufficient for any type of liner inserted into the cup, whether it be metal, ceramic, or polyethylene, without adequate testing or research to determine if the use of different liners may require a different design or construction of the cup or liner itself. Defendants' assumption that one liner is as easily interchangeable as another is tragically flawed.

63.     However, the Pinnacle® acetabular cup system is not equal to the other acetabular cup systems and polyethylene liners on the market due to serious design defects associated with the Pinnacle® acetabular cup which renders it dangerous even when used in the manner intended.

64.     The design of the Pinnacle® acetabular cup, in part, consists of a series of anti-rotation locking tabs which are intended to hold the polyethylene liner in place.

65.     These locking tabs are prone to failure, which results in the polyethylene liner becoming displaced and rotating away from its original position, causing the hard femoral head to come into direct contact with the metal shell of the Pinnacle® acetabular cup.  This dissociation of the polyethylene liner from the acetabular cup can also result in dislocation of the hip, dissociation, and extreme and excessive wear beyond that which would be normally anticipated.

66.     Often, when the locking tabs fail the polyethylene liner not only becomes displaced but also fractures.

11

67.    Furthermore, the Pinnacle® acetabular cup often utilizes screws with prominent screw heads that are drilled into the cup and pelvis for fixation. These screws may also contribute to polyethylene liner failures and fractures.

68.    Upon information and belief, in the early 2000's, Defendants made a series of changes to allow for the Pinnacle® acetabular cup to hold various different liners, including metal liners, polyethylene liners, and ceramic liners. These alterations included changes to the inner geometry of the Pinnacle® acetabular cup design in order to be able to accommodate different bearings. Additionally, Defendants made changes to the locking mechanism of the Pinnacle® acetabular cup and replaced their locking ring and rotation tabs design/formulation with a taper-lock mechanism and six tabs so that the acetabular cup would be capable of accepting polyethylene, metal, and/or ceramic liners.

69.    Furthermore, Defendants changed the design of their polyethylene liners to a more peripheral liner shape and changed the material strength of their polyethylene liners. As a result, the polyethylene liners within the Pinnacle® acetabular cup sits high and protrudes from the cup itself. Therefore, if the neck impinges on the Pinnacle® acetabular cup it will make contact with the polyethylene liner and can cause issues with disassociation.

70.    Upon information and belief, these changes to the geometry of the Pinnacle® acetabular cup, the peripheral liner shape of Defendants' polyethylene liners, Defendants' changes to the material strength of polyethylene liners, and Defendants' decision to switch to a taper locking mechanism caused the locking mechanism of the Pinnacle® acetabular cup to become weak and susceptible to liner disassociation.

71.    Other well-designed acetabular cups and polyethylene liners are not prone to disassociation like the Pinnacle® acetabular cup system.

72. The weakened locking mechanism of the Pinnacle® acetabular cup leads to disassociation of the polyethylene liners even when the cup and femoral head are both well affixed and properly positioned.

73. The failure of the Pinnacle® acetabular cup can occur well before the expected useful life of the product expires and can occur without any trauma or injury to the hip itself. Often, these locking failures and associated liner disassociations occur long before a metal-on-polyethylene hip is subject to revision from traditional and anticipated wear.

## II. Plaintiff's Injury

74. At all times pertinent hereto, Defendants were engaged in the business of developing, designing, testing, manufacturing, marketing, distributing, and selling the Pinnacle® acetabular cup.

75. Plaintiff was implanted with the following components on August 13, 2020, manufactured, designed, tested, developed, marketed, distributed and sold by Defendants:

    a. DePuy Actis size 4, std offset stem with 32mm head and + 5mm neck

    b. DePuy Pinnacle acetabular component size 52OD

76. The hip prosthetic parts identified above will be collectively referred to herein as the "DePuy Components."

77. On August 13, 2020, Dr. Tyler Noble performed a total hip replacement surgery on Plaintiff's left side at Conway Medical Center in Conway, South Carolina. Dr. Noble used one or more of the DePuy Components listed above for Plaintiff's hip prosthesis. Part of the components implanted into Plaintiff included the Pinnacle® acetabular cup and associated polyethylene liner.

13

78.     In connection with the surgery, Plaintiff was charged for and purchased one or more of the DePuy Components including the Pinnacle® acetabular cup and associated polyethylene liner.

79.     Plaintiff presented to her physician with ongoing complaints of hip pain, difficulty bearing weight, catching and locking of the hip.

80.     On May 25, 2023, Dr. Dustin Hambright performed a left hip revision surgery on Plaintiff at East Cooper Medical Center, during which Dr. Hambright confirmed that Plaintiff's DePuy Components had failed.

81.     The operative report for the procedure noted the following indications for surgery: "FAILED L THA ACETABULAR LINER, introp Metallosis, metal wear at acetabular component."

82.     In the operative report, Dr. Hambright noted that there was:

> [S]ignificant metallosis with darkened tissues and darkened motoroil color joint fluid. The gluteus minimus had significant metallosis and degeneration. The gluteus medius was intact as well as the posterior soft tissues and capsule. The capsule had a inner metallosis rind formation. The metallosis issues were debrided and tissue was sent to microbiology and pathology.

83.     Dr. Hambright further described the significant damage to the acetabular liner as follows:

> It was noted that the acetabular liner was dissociated inferior and the femoral head articulated with the acetabular component metal inner shell. The hip was then dislocated and femoral head removed. There was significant metal striping on the ceramic head. The femoral stem was notably stable. The loose liner was removed and had notably sheered off locking tabs. The acetabular component notably was stable but had significant wear superior from the articulation of the femoral head.

84.     Upon information and belief, the locking mechanism of Plaintiff's Pinnacle® acetabular cup failed and/or the composition and shape of the polyethylene liner caused the polyethylene liner to dissociate from the cup and to fracture. Upon the liner fracturing, the ceramic

14

femoral head of Plaintiff's hip implant was able to make direct contact with the metal surface of the Pinnacle® acetabular cup. As the femoral head grinded upon the metal of the Pinnacle® acetabular cup it generated metal ions which entered Plaintiff's tissue. The evidence of the toxicity of these metal ions was visible and obvious, as metallosis was noted by Plaintiff's explanting physician. The metallosis had to be debrided/removed from Plaintiff's surrounding tissues.

85.     As a direct and/or proximate result of the defective nature of the DePuy Components, specifically the failure of the locking mechanism of the Pinnacle® acetabular cup which caused the polyethylene liner to dissociate, Plaintiff has suffered physical and mental pain, disability, disfigurement, loss of enjoyment of life and lifestyle, economic losses, and medical expenses, as further described herein.

**CAUSES OF ACTION**

**COUNT I**
**STRICT LIABILITY – DESIGN DEFECT**
**(S.C. Code § 15-73-10)**

86.     Plaintiff incorporates by reference Paragraphs 24-85 as if fully set forth herein.

87.     At all times relevant herein, there was in full force and effect certain statutes of the State of South Carolina pertaining to "sellers" of defective products as set forth in S.C. Code § 15-73-10.

88.     Defendants designed, tested, manufactured, distributed, sold, and/or placed into the stream of commerce the DePuy Components.

89.     Pursuant to S.C. Code § 15-73-10, Defendants are strictly liable for designing, testing, manufacturing, distributing, selling, and/or placing a defective and unreasonably dangerous product into the stream of commerce.

15

90.     At all times relevant herein, Defendants' products, including but not limited to the DePuy Components, were expected to reach, and did reach, consumers in the State of South Carolina, including Plaintiff, without substantial changes in the conditions in which they were sold.

91.     At all times relevant herein, the DePuy Components were used in an intended and/or foreseeable manner. Neither Plaintiff nor Plaintiff's medical providers misused nor materially altered the DePuy Components.

92.     Upon information and belief, DePuy Components implanted in Plaintiff on August 13, 2020, were defective in their design and/or their formulation, in that they were not reasonably fit, suitable, or safe for their intended purpose and/or that their foreseeable risks exceeded the benefits associated with their designs and/or formulations. Thus, the DePuy Components implanted in Plaintiff on August 13, 2020, were unreasonably dangerous.

93.     At all times material to this action, the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in defective and unreasonably dangerous conditions at the time they were placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

        a. When placed into the stream of commerce, the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting Plaintiff to risks that exceeded the benefits of the subject product, including, but not limited to, serious and permanent personal injuries;

b. When placed in the stream of commerce, the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were defective in design and/or formulation, making their use more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other joint replacements on the market;

c. The design defect in the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, existed before they left the control of the Defendants;

d. The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were insufficiently tested;

e. The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, caused harmful side effects, injuries, and/or damages that outweighed any potential utility; and/or

f. The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were not accompanied by adequate instructions and/or warnings to fully apprise Plaintiff and/or her healthcare providers, of the full nature and extent of the risks and side effects associated with their use, thereby rendering Defendants liable to Plaintiff.

94. Specifically, Defendants made a series of design changes to allow for the Pinnacle® acetabular cup to hold various different liners including metal liners, polyethylene liners, and ceramic liners. These alterations included changes to the inner geometry of the Pinnacle® acetabular cup design in order to be able to accommodate different bearings and liners. Additionally, Defendants made design changes to the locking mechanism of the Pinnacle®

acetabular cup and replaced their locking ring and rotation tabs design/formulation with a taper-lock mechanism and six anti-rotation tabs so that the acetabular cup would be capable of accepting polyethylene, metal, and/or ceramic liners.

95.    Furthermore, Defendants changed the design of their polyethylene liners to a more peripheral liner shape and changed the material strength of their polyethylene liners. As a result, the polyethylene liners within the Pinnacle® acetabular cup sits high and protrudes from the cup itself. Therefore, if the neck impinges on the Pinnacle® acetabular cup it will make contact with the polyethylene liner and may cause issues with disassociation of the liner.

96.    Upon information and belief, these changes to the geometry of the Pinnacle® acetabular cup, the peripheral liner shape of Defendants' polyethylene liners, Defendants' changes to the material strength of polyethylene liners, and Defendants' decision to switch to a taper locking mechanism caused the locking mechanism of the Pinnacle® acetabular cup to become weak and susceptible to liner disassociation.

97.    Likewise, Defendants' design choice to utilize screws with prominent heads contributes to potential liner failures and a higher rate of disassociation.

98.    The failure of the Pinnacle® acetabular cup locking mechanism as it is designed results in the polyethylene liner becoming displaced and rotating away from its original position causing the hard femoral head to come into direct contact with the metal shell of the Pinnacle® acetabular cup. This articulation of the femoral head can result in the generation of metal ions and associated injuries.

99.    These design choices are unreasonably dangerous as the failure of the locking mechanism and the disassociation of the polyethylene liner from the Pinnacle® acetabular cup

results in the femoral head making contact with the metal composition of the Pinnacle® acetabular cup and generates toxic metal ions in addition to fractured liners and various other injuries.

100. The toxic nature of metal ions and the dangerous condition that can result from the articulation of hard surface against a metal surface are well known and foreseeable to Defendants given their extensive experience and history with metal ions and metallosis.

101. Defendants' design of its Pinnacle® acetabular cup systems are likewise unreasonably dangerous when compared to other acetabular metal cups which use a polyethylene liner but contain a proper and adequate mechanism as such devices do not have disassociation rates comparable to that of the Pinnacle® acetabular cup system.

102. The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants, even though they were defective in design and/or formulation, in that, when the DePuy Components left the hands of the Defendants, they were unreasonably dangerous, and/or they were more dangerous than an ordinary consumer would expect, for the DePuy Components implanted within Plaintiff on August 13, 2020, were not designed and/or formulated to last.

103. At all times herein mentioned, the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were in a defective condition and/or were unsafe, and Defendants knew or should have known that at all times mentioned, the DePuy Components implanted within Plaintiff on August 13, 2020, were in a defective condition and were inherently dangerous and unsafe.

104. In addition, at the time that the DePuy Components left the control of Defendants, there was a practical and/or feasible alternative design that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated

19

and/or intended function of the DuPuy Components. These safer alternative designs were economically and technologically feasible and would have prevented and/or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

105.   The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were defective in their design and/or their formulation, such that they were not reasonably fit, suitable, and/or safe for their intended purpose, and/or their foreseeable risks exceeded the benefits associated with their design and formulation. Thus, the DePuy Components were unreasonably dangerous in design.

106.   Plaintiff could not, by the exercise of reasonable care, have discovered the defects in the DePuy Components herein mentioned and/or perceived the danger in the DePuy Components implanted in her left hip on August 13, 2020, as she is a simple lay person with no medical or bioengineering training or education. Furthermore, Plaintiff's physicians were likewise unaware of the dangerous condition posed by the design of the Pinnacle® acetabular cup system's locking device as they were unaware that it was prone to failure and not adequately designed to prevent disassociation of the polyethylene liner.

107.   As a direct and proximate cause of said design defects in the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, Plaintiff has experienced and will continue to experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, metallosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

108.   WHEREFORE, Plaintiff demands judgment against Defendants for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action,

20

attorneys' fees, and for any other such further relief as this Court and/or jury may deem just and proper.

## COUNT II
### STRICT LIABILITY - FAILURE TO WARN
### (S.C. Code § 15-73-10)

109. Plaintiff incorporates by reference Paragraphs 24-85 as if fully set forth herein.

110. At all times relevant herein, there was in full force and effect certain statutes of the State of South Carolina pertaining to Sellers of Defective Products as set forth in S.C. Code § 15-73-10.

111. Defendants designed, tested, manufactured, distributed, sold, and/or placed into the stream of commerce the DePuy Components.

112. Pursuant to S.C. Code § 15-73-10, Defendants are strictly liable for designing, testing, manufacturing, distributing, selling, and/or placing a defective and unreasonably dangerous product into the stream of commerce.

113. At all times relevant herein, Defendants' products, including but not limited to the DePuy Components, were expected to reach, and did reach, consumers in the State of South Carolina, including Plaintiff, without substantial changes in the conditions in which they were sold.

114. At all times relevant herein, the DePuy Components were used in an intended and/or foreseeable manner. Neither Plaintiff nor Plaintiff's medical providers misused or materially altered the DePuy Components.

115. The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were defective and/or unreasonably dangerous when they left the possession of the Defendants, in that they contained warnings insufficient to alert consumers, including Plaintiff and her health care

21

providers, of the dangerous risks and reactions associated with the subject DePuy Components. Thus, the subject products were unreasonably dangerous because an adequate warning was not provided.

116. Alternatively, based on Defendants' post-market surveillance, pharmacovigilance and follow-up, Defendants knew or should have acquired knowledge of these defective characteristics of the DePuy Components, including Pinnacle® acetabular cup system and associated polyethylene liners, but despite said knowledge, failed to act as a reasonably prudent manufacturer to provide an adequate warning to physicians and consumers.

117. Defendants failed to warn and continue to fail to warn physicians and consumers of the true risks associated with the use of the Pinnacle® acetabular cup system and associated polyethylene liners.

118. Specifically, Defendants knew of specific warning signs of liner disassociation, i.e., an audible popping sound, and failed to warn physicians and patients to immediately seek treatment to avoid unintended damage to surrounding tissue and unintended wear of components that are not supposed to articulate against each other (i.e., without a liner in between).

119. Defendants have failed to accurately and adequately disclose that the alterations to the design of the Pinnacle® acetabular cup system and associated liners render the device weak in that its locking mechanism is inadequate to ensure that the polyethylene liner stays in place.

120. Defendants have failed and continue to fail to warn physicians and consumers, including Plaintiff and her physicians, that by altering the design of the locking mechanism of the Pinnacle® acetabular cup, the geometry of the cup, and the composition and design of the polyethylene liner itself the device is subject to disassociation and failure of the polyethylene liner.

22

121.    Furthermore, Defendants have failed to warn and continue to fail to warn physicians and consumers, including Plaintiff and her physicians, of the true risks associated with liner disassociation from the Pinnacle® acetabular cup including failing to warn of the generation of toxic metal ions and adverse effects associated with the generation of such ions.

122.    At the time Plaintiff's physician implanted the Pinnacle® acetabular cup system and its associated polyethylene liner in Plaintiff, Plaintiff's physician was unaware of such risks for liner disassociation.

123.    Had Plaintiff or Plaintiff's physician been aware of such risks, Plaintiff would have opted for a different hip implant system and or acetabular device.

124.    Plaintiff could not, by the exercise of reasonable care, have discovered the defects in the DePuy Components herein mentioned and/or perceived the danger in the DePuy Components implanted in her left hip on August 13, 2020, as she is a simple lay person with no medical or bioengineering training or education. Furthermore, Plaintiff's physicians were likewise unaware of the dangerous condition posed by the manufacture and/or design of the Pinnacle® acetabular cup system's locking device as they were unaware that it was prone to failure and not adequately manufactured and/or designed to prevent disassociation of the polyethylene liner.

125.    As a direct and proximate cause of said inadequate warnings for the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, Plaintiff has experienced and will continue to experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, metallosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

126.    WHEREFORE, Plaintiff demands judgment against Defendants for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, attorneys' fees, and for any other such further relief as this Court and/or jury may deem just and proper.

## COUNT III
## NEGLIGENCE

127.    Plaintiff incorporates by reference Paragraphs 24-85 as if fully set forth herein.

128.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the DePuy Components into the stream of commerce, including a duty to ensure that the device would not cause those who had it surgically implanted to suffer adverse harmful effects from it.

129.    Defendants failed to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the DePuy Components into the stream of commerce in that Defendants knew or should have known that those individuals that had the device surgically implanted were at risk of suffering harmful effects from it including but not limited to partial or complete loss of mobility, loss of range of motion, metallosis, and the need to have a revision surgery.

130.    The negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a. Negligently designing the DePuy Components in a manner which was dangerous to those individuals who had the device surgically implanted, including Plaintiff;

24

b. Designing, manufacturing, producing, creating, and/or promoting the DePuy Components without adequately, sufficiently, or thoroughly testing them;

c. Not conducting sufficient testing programs to determine whether or not the DePuy Components were safe for use;

d. Defendants herein knew or should have known that the DePuy Components were unsafe and unfit for use by reason of the dangers to their users;

e. Selling the DePuy Components without making proper and sufficient tests to determine the dangers to their users;

f. Negligently failing to adequately and correctly warn Plaintiff or her physicians, hospitals and/or healthcare providers of the dangers of the DePuy Components;

g. Negligently failing to recall their dangerous and defective DePuy Components at the earliest date that it became known that the device was, in fact, dangerous and defective;

h. Failing to provide adequate instructions regarding safety precautions to be observed by surgeons who would reasonably and foreseeably come into contact with, and more particularly, implant the DePuy Components into their patients;

i. Negligently advertising and recommending the use of the DePuy Components, despite the fact that Defendants knew or should have known of their dangerous propensities;

j.  Negligently representing that DePuy Components offered was safe for use for its intended purpose, when, in fact, they were unsafe;

k.  Negligently manufacturing the DePuy Components in a manner which was dangerous to those individuals who had them implanted;

l.  Negligently producing the DePuy Components in a manner which was dangerous to those individuals who had them implanted;

m.  Negligently assembling the DePuy Components in a manner which was dangerous to those individuals who had them implanted;

n.  Defendants under-reported, concealed important relevant information, underestimated and downplayed the serious danger of DePuy Components.

131.    Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of the Pinnacle® acetabular cup system in that they:

a.  Failed to use due care in designing and manufacturing the DePuy Components so as to avoid the aforementioned risks to individuals that had the devices surgically implanted, including Plaintiff;

b.  Failed to accompany their product with proper warnings;

c.  Failed to accompany their product with proper instructions for use;

d.  Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the DePuy Components; and

e.  Were otherwise careless and/or negligent.

26

132. Despite the fact that Defendants knew or should have known that the DePuy Components caused harm to individuals that had the device surgically implanted, including Plaintiff, Defendants continued to market, manufacture, distribute and/or sell the DePuy Components.

133. Defendants knew or should have known that consumers such as Plaintiff would suffer foreseeable injury, and/or be at increased risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

134. Plaintiff could not, by the exercise of reasonable care, have discovered the defects in the DePuy Components herein mentioned and/or perceived the danger in the DePuy Components implanted in her left hip on August 13, 2020, as she is a simple lay person with no medical or bioengineering training or education. Furthermore, Plaintiff's physicians were likewise unaware of the dangerous condition posed by the manufacture and/or design of the Pinnacle® acetabular cup system's locking device as they were unaware that it was prone to failure and not adequately manufactured and/or designed to prevent disassociation of the polyethylene liner.

135. As a direct and proximate cause of said negligence, Plaintiff has experienced and will continue to experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, metallosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

136. Defendants acted with willful, wanton, or reckless disregard so as to justify an award of punitive or exemplary damages.

137. WHEREFORE, Plaintiff demands judgment against Defendants for all actual and compensatory damages she suffered, as well as for punitive damages in an amount sufficient to

27

keep such wrongful conduct from being repeated, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Court and/or jury may deem just and proper.

## COUNT IV
## BREACH OF EXPRESS WARRANTY
### (S.C. Code § 36-2-313)

138.    Plaintiff incorporates by reference Paragraphs 24-85 as if fully set forth herein.

139.    At all times relevant herein, Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the DePuy Components implanted in Plaintiff's left hip on August 13, 2020.

140.    Upon information and belief and at all times pertinent herein, Defendants expressly represented to Plaintiff and/or to her healthcare providers that the DePuy Components implanted in Plaintiff's left hip on August 13, 2020, were safe and/or fit for their intended purposes and that they were of merchantable quality, adequately tested, and did not produce negative side effects.

141.    Upon information and belief, Plaintiff and/or her healthcare providers relied upon Defendants' express representations which became part of the basis of the bargain.

142.    The DePuy Components implanted in Plaintiff's left hip on August 13, 2020, did not conform to Defendants' representations because they were not safe and effective, but rather caused Plaintiff to suffer severe and painful personal injuries and damages.

143.    Specifically, Defendants' DePuy Components were not safe and effective given that they were unreasonably dangerous and posed an elevated risk for liner disassociation and catastrophic injury compared to other acetabular cup and polyethylene liner systems.

144.    Defendants' DePuy Components were not safe and effective in that the locking mechanism, among other characteristics of the device, was defective and prone to failure which

28

rendered the device unreasonably dangerous due to its inability to properly hold the polyethylene liner in place to prevent disassociation, liner fracture, and the generation of metal ions.

145. At all relevant times, the DePuy Components did not perform as safely as an ordinary consumer would expect or when used as intended or a in a reasonably foreseeable manner.

146. At the time of making the express warranties, Defendants knew or should have known of the purposes for which the DePuy Components were to be used and warranted the same to be, in all respects, fit, safe, and effective for such proper purposes.

147. As a direct and proximate cause of said breach of express warranties, Plaintiff has experienced and will continue to experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, metallosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

148. WHEREFORE, Plaintiff demands judgment against Defendants for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, attorneys' fees, and for any other such further relief as this Court and/or jury may deem just and proper.

### COUNT V
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. Code § 36-2-314)

149. Plaintiff incorporates by reference Paragraphs 24-85 as if fully set forth herein.

150. At all times relevant herein, Defendants are and were "merchants" as to the DePuy Components within the meaning of S.C. Code Ann. § 36-2-104.

151. At all times relevant herein, Defendants manufactured and sold the DePuy Components which are "good[s]" within the meaning of these statutory provisions. Consequently, pursuant to S.C. Code § 36-2-314, at the time of sale of the DePuy Components, Defendants

impliedly warranted that the DePuy Components implanted in Plaintiff's left hip on August 13, 2020 were merchantable, including that they were fit for their ordinary purposes.

152. At the time Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Pinnacle Device, Defendants knew the use for which the DePuy Components were intended, and impliedly warranted the DePuy Components to be of merchantable quality and safe for such use.

153. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the DePuy Components were of merchantable quality and safe for its intended use.

154. Contrary to Defendants' implied warranties, the DePuy Components were not of merchantable quality or safe for its intended use, because the DePuy Components was unreasonably dangerous in that the locking mechanism, among other characteristics of the device, was defective and prone to failure which rendered the device unreasonably dangerous due to its inability to properly hold the polyethylene liner in place to prevent disassociation, liner fracture, and the generation of metal ions.

155. As a direct and proximate cause of said breach of implied warranties, Plaintiff has experienced and will continue to experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, metallosis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

156. WHEREFORE, Plaintiff demands judgment against Defendants for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, attorneys' fees, and for any other such further relief as this Court and/or jury may deem just and proper.

## COUNT VI
## VIOLATION OF SOUTH CAROLINA
## CONSUMER PROTECTION LAW
### (S.C. Code § 39-5-10, *et seq.* )

157.    Plaintiff incorporates by reference Paragraphs 24-85 as if fully set forth herein.

158.    At all times mentioned herewith the Defendants are persons engaged in the trade or commerce under S.C. Code Ann. § 39-5-10.

159.    Plaintiff purchased and used the DePuy Components and suffered ascertainable losses as a result of Defendants' actions in violation of these consumer protection laws.

160.    Had Defendants not engaged in the deceptive conduct described herein, neither Plaintiff nor her physicians would have purchased and/or paid for the DePuy Components; nor would Plaintiff have incurred related medical costs and injuries from using the DePuy Components.

161.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monies from Plaintiff and/or Plaintiff's physicians for the device that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

162.    Unfair methods of competition or deceptive acts or practices that were proscribed by law include the following:

   a.    Representing that goods or services have approval, characteristics, ingredients, uses benefits or quantities that they do not have;

   b.    Advertising goods or services with the intent not to sell them as advertised; and

   c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

31

163.     Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. Each aspect of Defendants' conduct was intended to artificially create sales of the DePuy Components.

164.     Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of products.

165.     On information and belief, Defendants had actual knowledge of the defective and dangerous condition of the DePuy Components and failed to take any action to cure those conditions.

166.     Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which hip implant to use.

167.     By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and is entitled to statutory and compensatory damages in an amount to be proven at trial.

168.     The carelessness, negligence, and misrepresentations of the Defendants, as more particularly set out hereinabove, constitute unfair or deceptive acts or practices within the meaning of S.C. Code Ann. § 39-5-10, *et seq*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a.   Judgment in favor of Plaintiff and against all Defendants;

b.   Past and future physical pain and suffering;

c.   Past and future mental anguish and emotional distress;

d.   Past and future medical expenses;

e.   Future medical monitoring;

32

  f. Loss of the enjoyment of life;

  g. Loss of earning capacity;

  h. Loss of the chance of a better medical outcome (pled in the alternative to the above);

  i. Punitive and/or exemplary damages in such amounts as may be proven at trial;

  j. Attorneys' fees and costs;

  k. Pre- and post-judgment interest; and

  l. Any and all further relief, both legal and equitable, that the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 11, 2026

Respectfully submitted:

*/s/ Elizabeth M. Burke*
Elizabeth Middleton Burke (Fed. I.D. 7466)
Christiaan A. Marcum (Fed. I.D. 7556)
Misty Black O'Neal (Fed. I.D. 12262)
ROGERS PATRICK WESTBROOK &
BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
Ph: (843) 727-6500
Fax: (843) 216-6509
bburke@rpwb.com
cmarcum@rpwb.com
moneal@rpwb.com

And

Jessica A. Reynolds (La. Bar No. 34024)
*Pro Hac Vice to be filed*
**PENDLEY, BAUDIN & COFFIN, LLC**
P.O. Drawer 71

24110 Eden Street
Plaquemine, Louisiana 70765
Tel: (225) 687-6396
Fax: (225) 687-6398
E-Mail: jreynolds@pbclawfirm.com

*Attorneys for Plaintiff*